IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-01067-NRN

DANIEL E. HALL,

Plaintiff,

v.

BASSETT & ASSOCIATES, INC.,

Defendant.

---

**ORDER ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. #25)**

---

**N. REID NEUREITER
United States Magistrate Judge**

This matter is before me upon the consent of the parties to magistrate judge jurisdiction (Dkt. #12) and the Order of Reference entered by Chief Judge Philip A. Brimmer on June 15, 2020 (Dkt. #13). Now before me is Defendant Bassett & Associates, Inc.'s ("Bassett" or "Defendant") Motion for Summary Judgment, filed March 19, 2021 (Dkt. #25). I have carefully considered the motion (Dkt. #25), Plaintiff Daniel E. Hall's Response (Dkt. #29), and Defendant's Reply (Dkt. #30). I heard oral argument from the parties (*see* Dkt. #31) and have taken judicial notice of the file. Now being fully informed and for the reasons discussed below, it is hereby **ORDERED** that the subject motion (Dkt. #25) is **GRANTED** with respect to all claims.

# **I. BACKGROUND**[1]

Bassett is an established Colorado construction company that served as general contractor for the construction of Cherry Creek Elementary School #44 (the "Project"). Dkt. # 25 at 2–3, ¶¶ 1–3. Mr. Hall is 73 years old and experienced in construction management, with a college degree, over 25 years' experience in the construction and development industry, and various certificates and training. *Id.* at 3 & 4, ¶¶ 4 & 14. On June 12, 2017, Mr. Hall accepted Bassett's offer for a position as "management-type superintendent," with an annual salary of $82,000 per year. *Id.* at 4, ¶¶ 15–16. In this lawsuit, Mr. Hall asserts that he was a non-exempt employee and that Bassett violated state and federal wage and hour laws by failing to pay him overtime for all of the hours he worked over 40 in a week or over 12 in a day. Dkt. #5 at ¶ 2.

Before joining Bassett, Mr. Hall was a salaried project manager/superintendent at PSR West Coast Builders. Dkt. #25 at 3, ¶¶ 7 & 9. In the construction industry, the superintendent role is relatively universal and generally entails supervision and management of on-site activities, such as coordinating and scheduling various trades and labor, and generally acting as the on-site manager. *Id.*, ¶ 10. For example, at PSR West Coast Builders, Mr. Hall's duties included supervising construction, directing subcontractors and laborers, terminating employees and poorly performing subcontractors, making scheduling decisions, changing documents, and approving extra work. Dkt. #29 at 2, ¶ 8. As discussed below, however, Mr. Hall claims that that

---

[1] The following factual summary is based on the parties' briefs on the Motion and documents submitted in support thereof. These facts are undisputed unless attributed to a party or source. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

the work he performed on the Project for Bassett was not similar to other superintendent roles in the construction industry. *Id.* at 2–3, ¶ 10.

Prior to hiring Mr. Hall, Bassett had, among other things, already bid on and secured the Project, determined the initial contract price for vendors, estimated the material cost, and secured subcontractors and the initial contractual payments for subcontractors. Dkt. #25 at 5, ¶ 17. Thus, Mr. Hall was not involved in these developments and decisions. He also did not hire any Bassett employees or determine how much they would make. Dkt. #29 at 10, ¶¶ 17–18. As a general matter, Mr. Hall had no responsibilities for carrying out tasks related to, among other things: finance, accounting, taxes, auditing, insurance, purchases, advertising, marketing, research, government relations, or employee benefits. *Id.* at 11, ¶ 21.

During the first two months or so of his employment with Bassett, while waiting for construction on the Project to begin, Mr. Hall was involved in the subcontractor submittal process, an assignment typically completed by the project manager. Dkt. #25 at 5, ¶¶ 18–19. This was the only project manager-type task he worked on during his time at Bassett. Dkt. #29 at 4, ¶ 19.

When construction on the Project began, Mr. Hall and Dan Larson worked together as superintendents. Dkt. #25 at 6, ¶ 21. Most decisions were made jointly between the two, although Mr. Hall handled the bulk of the administrative tasks and paperwork. *Id.*, ¶¶ 23–24. Mr. Hall describes his primary duty as a superintendent as making sure the Project was constructed on time in accordance with the contract documents (i.e., the spec book, drawings, and signed submittals). Dkt. #29 at 8, ¶ 1. Mr. Hall scheduled government inspections and was SWMP administrator, meaning he

ensured compliance with the erosion control regulations. Dkt. #25 at 4–5, ¶¶ 25–27. There were approximately 40 subcontractors and some Bassett employees working on the Project. Dkt. #29 at 9 & 10, ¶¶ 12 & 16. Mr. Hall spent much of his day communicating with, supervising, directing, and/or scheduling subcontractors and workers. Dkt. #25 at 7, ¶ 28. Mr. Hall had the discretion to handle scheduling issues as they arose and walked the site to confirm that the work being done conformed with the Project's plans and specifications. *Id.* at 6–7, ¶¶ 30–34. Other Bassett employees on the site, excluding Mr. Larson, did not have the knowledge, experience, or qualification to ensure that work followed with the construction plan. *Id.* at 7, ¶ 36. However, neither Mr. Hall nor Mr. Larson had any authority to change the site plan or contract documents. Dkt. #29 at 9, ¶ 8.

As superintendents, Mr. Hall and Mr. Larson had the authority to approve certain expenses and make purchases for the Project, sign binding documents on behalf of Bassett, and acknowledge change orders to contracts, although according to Mr. Hall, none of his purchases were significant given the overall scope of the Project. Dkt. #29 at 6, ¶¶ 38–39. Mr. Hall also acknowledged completed work and signed off on subcontractors' extra hours and Bassett employees' timesheets. Dkt. #25 at 9–10, ¶¶ 40 & 47. Mr. Hall's own timecards indicate full workdays of "Supervision." *Id.* at 10, ¶ 49.[2] He could not recall any day where he spent more than two hours engaged in manual labor, such as picking up trash or driving a forklift. *Id.*, ¶ 50.

---

[2] Upon my review of Mr. Hall's timecards, during the week of September 17, 2017, he spent two, eight-hour days sweeping glass. *See* Dkt. #29-3 at 28. All other hours entered were for "Supervision."

While not a safety inspector, Mr. Hall testified that, as a superintendent, he was responsible for telling other individuals that they were not following safety guidelines, *see* Hall Dep., Dkt. #25-5 at 93, and he reported safety infractions and completed accident reports. Dkt. #25 at 9, ¶ 44. The parties disagree whether Mr. Hall had the authority to terminate Bassett laborers, but according to Mr. Larson's testimony, superintendents can kick workers off the job site for safety violations. Larson Dep., Dkt. #25-22 at 54–55.

After his employment at Bassett ended, Mr. Hall asserted a claim with the Colorado Department of Labor and Employment ("CDLE") for unpaid vacation wages based on Bassett's accrual policy that only applied to salaried employees, and in his complaint, Mr. Hall stated he did not work any overtime hours or have any unpaid overtime wages. *Id.* at 9–10, ¶¶ 51–54. He was awarded his unpaid vacation pay. *Id.*, ¶ 55.

In his Complaint (Dkt. #5), Mr. Hall brings claims of alleged overtime violations under the Colorado Wage Claim Act ("CWCA"), Colo. Rev. Stat. § 8-4-101 *et seq.*, and the Fair Labor Standards Act ("FLSA") 29 U.S.C. § 201 *et seq.* Mr. Hall alleges that Bassett improperly classified him as an exempt employee and owes him overtime, as he worked an average of nearly 50 hours per week during the 79 weeks he worked for the company. Bassett now moves for summary judgment.

## II. LEGAL STANDARDS

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Under Fed. R. Civ. P. 56(c), summary judgment shall be granted if "the

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 277 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the case under the governing substantive law. *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323). When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* at 671. If the movant carries the initial burden of making a prima facie showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable jury could find in his favor. *See Anderson*, 277 U.S. at 248; *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most favorable to him. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324). Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). The nonmoving party's

evidence must be more than "mere reargument of [his] case or a denial of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan Wright et al., *Federal Practice and Procedure* § 2738 (4th ed. 2017).

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works, Inc., v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

Only documents that meet the evidentiary requirements of Fed. R. Civ. P. 56 may be considered for purposes of summary judgment. Rule 56(c) provides that:

> (1) A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]
>
> ...
>
> (3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.

(4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c)(1)–(4).

## III. ANALYSIS

### a. Exemptions under the CWCA and the FLSA

Both the FLSA and the CWCA address overtime compensation violations. Under the FLSA, employers must pay non-exempt employees federal minimum wage and one and one-half times their regular hourly rate for any hours worked in excess of 40 hours in a single work week. 29 U.S.C. §§ 206(a), 207. An employer who fails to do so is liable to its employees for the unpaid wages plus liquidated damages that include costs and attorney's fees. 29 U.S.C. § 216(b). Under the CWCA, employers are required to pay non-exempt employees the Colorado minimum wage and one and one-half times their regular hourly rate for any hours worked in excess of 40 hours in a single work week, 12 hours in a single work day, or 12 consecutive hours, excluding duty-free meal periods, whichever results in the greatest calculation of wages. Colo. Rev. Stats. §§ 8-6-104–06; 7 Code Colo. Regs. §§ 1103-1:3, 1:4 (2018)[3] ("Colorado Minimum Wage Order"). An employer who fails to do so is liable to its employees for the unpaid wages as well as costs and attorney's fees. Colo. Rev. Stats. §§ 8-6-1–118; 7 Code Colo. Regs. § 1103-1:18.

The FLSA and the CWCA exempt administrative, executive/supervisor, and professional employees from their overtime pay requirements. *See* 29 C.F.R. § 541.0; 7

---

[3] As Bassett does (with no objection from Mr. Hall), I will reference the 2018 version (#34) of the Colorado Minimum Wage Order because it covers the applicable time period and is substantially similar to the 2017 version (#33), which was effective during the first half of Mr. Hall's employment.

Code Colo. § 1103-1:5. An employer must satisfy a two-part test to meet its burden of showing "that the employee fits 'plainly and unmistakenly within the exemption's terms'" *Aaron v. City of Wichita, Kan.*, 54 F.3d 652, 657 (10th Cir. 1995) (quoting *Reich v. State of Wyoming*, 993 F.2d 739, 741 (10th Cir. 1993)). First, under the "salary" test, "'the employer must prove that the employees in question are paid on a salary basis rather than an hourly rate.'" *Spradling v. City of Tulsa, Okl.*, 95 F.3d 1492, 1495–96 (10th Cir. 1996) (quoting Aaron, 54 F.3d at 657–58). The salary must meet a minimum weekly amount. *See* 29 C.F.R. §§ 5410.100, 541.200, 541.300; Code Colo. Regs. § 1103-1:5(b). Under the "duties" test, the employer must show that the employee's primary duties were executive, administrative, or professional in nature, as described in the regulations. *Hays v. City of Pauls Valley*, 74 F.3d 1002, 1007 (10th Cir. 1996).

"Whether an employee is exempt from the FLSA's overtime requirements is a mixed question of law and fact[.]" *Williams v. Genex Servs., LLC*, 809 F.3d 103, 109 (4th Cir. 2015). "The question of how the [employees] spent their working time . . . is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law . . .." *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986). The Supreme Court has instructed that, at least with regard to the FLSA, exemptions should be construed fairly, rather than narrowly. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

Mr. Hall concedes that he meets the salary test to qualify for the professional, administrative, and executive exemptions. *See* Dkt. #29 at 13. Therefore, I will turn to the duties test. Mr. Hall's superintendent title is insufficient by itself to establish exempt status; instead, I must focus on his primary duties. 29 C.F.R. § 541.2. The regulations

define "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). This is a holistic evaluation guided in part by the amount of time spent performing exempt work. While not the "sole test," employees "who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." 29 C.F.R. § 541.700(b). Other factors to consider when determining the primary duty of an employee include "the relative importance of the exempt duties as compared with other types of duties" and "the employee's relative freedom from direct supervision." 29 C.F.R. § 541.700(a).

### i. The Executive Exemption

The FLSA's executive exemption applies if: (1) the primary duty of the employee is management of the enterprise in which the employee is employed or management of a customarily recognized department or division thereof; (2) the employee customarily and regularly directs the work of two or more other employees; and (3) the employee has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees is given particular weight. *See* 29 C.F.R. § 541.100. Similarly, under Colorado law, to be considered an executive (or supervisor), the employee

> must supervise the work of at least two full-time employees and have the authority to hire and fire, or to effectively recommend such action. The executive or supervisor must spend a minimum of 50% percent of the workweek in duties directly related to supervision.

Code Colo. Regs. § 1103-1:5(b).

Bassett is a construction company, and Mr. Hall's job primary duty was to ensure that the Project was constructed on time in accordance with the contract documents. The first element is met.

Mr. Hall claims that he did not regularly direct the work of two or more employees. He points out that Bassett only had employees on site for five months, and states that "there is evidence [Hall] did not supervise or direct these employees' work." I reject out of hand the latter assertion. Mr. Hall admitted that he "spent the majority of his day communicating with, supervising, directing, and/or scheduling subcontractors and workers." Dkt. #29 at 5, ¶ 28. He also testified several times, to the point of exasperation, that his job as superintendent was to supervise what went on at the job site. *See* Hall Dep., Dkt. #25-5 at 96. He also signed off on every Bassett employee's timecard and directed employee Jessica Hutton throughout the duration of the project. I therefore find that he had the regularly directed the work of two or more Bassett employees.

However, I find that there is a factual dispute whether Mr. Hall had the authority to fire or promote any Bassett employee. He denies having this authority in his declaration. Dkt. #29-1 at 5, ¶¶ 35–36. Mr. Larson testified similarly. Larson Dep., Dkt. #25-22 at 56. I recognize that Vice President Chad Bassett says differently, and it is curious that Mr. Hall testified that on one occasion, he and Mr. Larson "probably" made the joint decision to terminate a Bassett employee who had not showed up. Dkt. #25-5 at 201. However, this discrepancy cannot be resolved on summary judgment.

### ii. The Administrative Exemption

I will next turn to whether Mr. Hall was employed in a bona fide administrative capacity. An employee qualifies under this exemption for FLSA purposes if (1) the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and (2) the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). In Colorado, an administrative employee is defined as:

> a salaried individual who directly serves the executive, and regularly performs duties important to the decision-making process of the executive. Said employee regularly exercises independent judgment and discretion in matters of significance and their primary duty is non-manual in nature and directly related to management policies or general business operations.

Code Colo. Regs. § 1103-1:5(a).

Although Mr. Hall performed some manual work, the superintendent position was not primarily manual in nature; Mr. Hall testified that he could not recall any day where he spent more than two hours engaged in manual labor. Dkt. #25 at 10, ¶ 50. Moreover, Mr. Hall admittedly was responsible for the on-site administrative-type work. *Id.* at 6, ¶ 24. Mr. Hall contends, though, that his primary duty did not directly relate to the running of Bassett. An employee meets the "directly related" test when she "must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a).

> Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; *quality control*; purchasing; procurement; advertising; marketing; research; *safety and health*; *personnel management*; human resources; employee benefits; labor relations; public relations, government relations; computer network,

> internet and database administration; legal and regulatory compliance; and similar activities.

29 C.F.R. § 541.201(b) (emphasis added).

Mr. Hall's argument that he merely "produced the product, the completed buildings," is not persuasive. First, Mr. Hall did not "produce the product"—the over 40 subcontractors that worked on the Project did. Second, Bassett is a general contractor responsible for overseeing construction of buildings. To run its business, it needs individuals to supervise, direct, and coordinate with its subcontractors to ensure that the building will be built on time, within budget, and in the proper manner. This is the responsibility that superintendents, including Mr. Hall, are tasked with, and it is directly related to Bassett's business. In addition to these quality control and personnel management responsibilities, Mr. Hall was responsible for on-site safety, at least more so than the average worker. *See* Hall Dep., Dkt. #25-5 at 93 (Mr. Hall testifying that he would be expected to tell other individuals that they were not following safety guidelines while a temporary laborer would not be expected to do so).

Mr. Hall next contends that he did not exercise discretion and independent judgment with respect to matters of significance. Again, I disagree. "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). The phrase "discretion and independent judgment"

> must be applied in light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the

employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b).

Mr. Hall heavily relies on inability to change the contract documents. This strikes me as far too narrow a focus. As Bassett points out, every construction project, to say nothing of multimillion-dollar ones like that at issue here, must be carried out in accordance in plans and specifications. The fact that Mr. Hall was limited in what decisions he could make without prior approval does not mean he lacked any ability to exercise discretion and independent judgment. First, because "employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level[,] . . . the term . . . does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review." 29 C.F.R. § 541.202(c). Mr. Hall does not cite any instances where he wanted to exercise discretion but was forbidden to do so.

But more importantly, Mr. Hall ignores that he undisputedly did exercise discretion and independent judgment in other important areas. Mr. Hall was responsible for ensuring compliance with erosion control regulations on the Project and received

extra training and a certification in this area. He was responsible for scheduling the subcontractors, and he directed and inspected the work done on the Project. He met with school officials and coordinated some permitting. He had at least some authority over on-site safety, and while he could not terminate a Bassett employee for violating safety protocols, as a superintendent, he could kick them off the site. He was not closely supervised in carrying out these duties, and admits they were important to the Project. Mr. Hall also had a company credit card and the authority to make purchases for the Project and sign binding documents on behalf of Bassett. *See* Dkt. #25-34 (expense reports Mr. Hall submitted to Bassett in excess of $2,000); #25-35 (Mr. Hall committing Bassett to $1,000+ change order).

Mr. Hall cites *Zeleznik v. Universal Restoration Servs. Se., Inc.*, No. 1:10-cv-2444-WEJ, 2011 WL 13244169 (N.D. Ga. Dec. 15, 2011), which, in turn, cites other cases, all of which Mr. Hall believes support of his position that the administrative exemption does not apply. That case and those cited in it are distinguishable.

As a general matter, they all construed FLSA exemptions narrowly when I now know I must give them a fair construction. *See Encino Motorcars*, 138 S. Ct. 1134 at 1142.

As to the specific cases, it is important to note that the court in *Zeleznik* recognized that courts have found that employees on construction sites holding superintendent-type positions and performing some of the same duties both did and did not fall under the administrative exemption. 2011 WL 13244169, at *9. The court also found that the fact that the plaintiff's "likely exempt" duties of managing the project's schedule, coordinating the subcontractors and ensured they had the necessary

materials to complete their tasks, communicating homeowner concerns to the estimator, and adjusting budget line items to keep the project cost within the estimate—without which "the projects could not be completed"—weighed in favor of applying the exemption. *Id.* at *10. However, factual issues regarding the amount of time the plaintiff spent doing exempt versus non-exempt work and as to the level of supervision he was subject to precluded summary judgment in favor of the defendant. *Id.* Here, on the other hand, it is undisputed that the majority of Mr. Hall's time was devoted to exempt-work tasks described by the *Zeleznik* court and he had the discretion to accomplish them as he saw fit. Moreover, the plaintiff in *Zeleznik* would only supervise approximately three subcontractors, *id.* at *7, while Mr. Hall supervised approximately 40.

The court in *Zeleznik* next determined it did not have sufficient facts to properly decide whether the plaintiff's primary duty included the exercise of discretion and independent judgment with respect to matters of significance, and cites the other two cases referenced by Mr. Hall in his brief, G*ottlieb v. Construction Services & Consultants, Inc.*, No. 05–14139–CIV, 2006 WL 5503644 (S.D. Fla. July 24, 2006), and *Cotten v. HFS–USA, Inc.*, 620 F. Supp. 2d 1342 (M.D. Fla. 2009). In *Gottlieb*,

> after a bench trial, the district court granted judgment to the plaintiff on a FLSA claim, finding that as a construction site project manager, plaintiff's primary duties were not administrative but focused on producing his employer's product—shells for houses. The project manager's primary duties in *Gottlieb* were scheduling subcontractors and supplies, filling out required forms, inspecting the subcontractors' work, and ensuring that shells were built in a timely manner.

*Id.* at *9. But there are important factual dissimilarities between *Gottlieb* and this case. Mr. Hall made almost twice as much as the project manager in *Gottlieb*, and the court described the final product of the defendant's business, shell houses, as a "commodity." 2006 WL 5503644, at *6. The same cannot be said for the construction of the

multimillion-dollar school Mr. Hall supervised. The plaintiff in *Gottlieb* also had an area manager that was heavily involved in the on-site activity, while Mr. Hall essentially operated as that person here. The *Gottlieb* court also notes that the plaintiff, unlike Mr. Hall, did not have the authority to hire day laborers without that manager's permission. These factual differences make the *Gottlieb* decision less persuasive.

The *Zeleznik* court also cites *Cotten*, where the district court denied an employer's motion for summary judgment on a FLSA claim because it found that, as a field supervisor, the plaintiff's duties of assigning work to subcontractors on the employer's approved list, ensuring they received work orders and the correct materials, and inspecting their work, were not administrative. *Cotten*, 620 F. Supp. 2d at1348–50. The *Cotten* court noted the similarities with the facts of *Gottlieb*, a case that I have already found unpersuasive. Moreover, the plaintiff in *Cotten* merely completed pre-printed inspection and work-report forms, noting the status of various ongoing jobs. *Id.* at 1349. Here, Mr. Hall was involved in the submittal process, signed off on timesheets, and authorized extra work. Unlike Mr. Hall, who had years of training, education, and certifications, the plaintiff in *Cotten* had no specialized training, and was subject to much more intensive supervision. The plaintiff in *Cotten* could not approve expenses over $200 while Mr. Hall submitted expense reports for ten times that amount. Finally, *Cotten* is offered as persuasive authority; I do not find it persuasive. *See Kotowski v. JGM Fabricators & Erectors, Inc.*, No. 18-1512, 2019 U.S. Dist. LEXIS 127937, at *20 (E.D. Pa. July 30, 2019). ("[T]he *Cotten* rationale is based on an unrealistic view of the construction industry and the respective roles of managers and laborers . . .. Under *Cotten*, nearly every employee, regardless of pay or supervisory status, would be

entitled to overtime."); *Zannikos v. Oil. Inspections (U.S.A.), Inc.*, 605 F. App'x 349, 354 (5th Cir. 2015) (finding that a broad interpretation of *Cotten* would render the administrative exemption "meaningless," because many employees whose primary duties directly relate to the management of customers perform the precise services offered by their employers).

There is another case cited in *Zeleznik* that Mr. Hall conspicuously does not address but is analogous to the facts before me:

> In *Black v. Coalaska Inc.*, No. C07–823JLR, 2008 WL 4681567 (W.D. Wash. Oct. 20, 2008), the district court granted summary judgment to the employer on an FLSA claim, concluding that the plaintiff project engineer engaged in exempt administrative duties where his responsibilities included the following: written and verbal communication with owners, signing subcontracts, signing change orders, supervising and directing the work of employees, determining the number of employees necessary at a job site, determining the hours worked by the crew, scheduling work, creating project schedules and sequencing work, preparing monthly costs analyses, signing pay estimates, drafting and ensuring compliance with owner-required plans, completing margin analysis on projects, imputing crew time cards, purchasing and scheduling materials, and ensuring projects met specifications. *Id.* at *9–10.

*Zeleznik*, 2011 WL 13244169, at *9. The *Black* court also determined that the plaintiff exercised discretion and independent judgment with respect to matters of significance as the person present at the job site directing the crew to complete the contracts. 2008 WL 4681567, at *9. I find the *Black* decision persuasive. Mr. Hall performed many of the same duties as the plaintiff in that case, including directing crews to complete multi-million-dollar contracts, binding the company on significant matters, and communicating with project owners and other contractors on Bassett behalf. *See id.*

Therefore, I find no genuine issue of material fact that Mr. Hall is an exempt administrative employee under both the FLSA and CWCA. He was compensated on a

salary or fee basis at a rate of not less than $455 per week, his primary duty was the performance of office or non-manual work directly related to the management or general business operations of Bassett and its customers, and his primary duty included the exercise of discretion and independent judgment with respect to matters of significance.

### iii. The Professional Exemption

To qualify for the professional exemption under the FLSA, (1) the employee's primary duty must be the performance of work requiring advanced knowledge; (2) the advanced knowledge must be in a field of science or learning; and (3) the advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction. 29 C.F.R. § 541.301(a). Colorado regulations define a professional employee as:

> a salaried individual employed in a field of endeavor who has knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study. The professional employee must be employed in the field in which they are trained to be considered a professional employee.

Code Colo. Reg. § 1103-1:5(c).

Work requiring advanced knowledge means work predominantly intellectual in character, including work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work. 29 C.F.R. § 541.301(b). The phrase "field of science or learning" includes traditional professional fields (law, medicine, science, etc.), as "distinguished from the mechanical arts or skilled trades where in some instances the knowledge is of a fairly advanced type but is not in a field of science or learning." 29 C.F.R. § 541.301(c). The advanced knowledge is customarily acquired by a prolonged course of specialized

intellectual instruction. 29 C.F.R. § 541.301(a)(3). Knowledge acquired through an apprenticeship or with training in the performance of routine mental, manual, mechanical or physical processes does not count. 29 C.F.R. § 541.301(d).

Bassett relies on *Stevins v. Provident Constr. Co.*, 137 F. App'x 198 (11th Cir. 2005), to support its argument that Mr. Hall qualifies for the professional exemption. There, the court concluded that, notwithstanding the fact that the position did not require a specific and mandatory educational prerequisite, a "construction superintendent must have advanced, specialized knowledge in order to perform his duties." 137 F. App'x at 199. Here, it is true that Mr. Hall has a college degree and decades of experience and training. However, there is a genuine issue of material fact regarding whether this knowledge and experience is necessary for Bassett superintendents because Chad Bassett testified that he worked as a superintendent for the company during a college internship. Dkt. #29 at 3, ¶ 11.

Moreover, the *Stevins* court affirmed district court's finding that the defendant's construction superintendents consistently exercised discretion and judgment because they:

> (1) were able to deviate from design plans without seeking approval from the project manager; (2) could order materials without needing approval from the project manager; (3) determined the answers to subcontractors' questions that arose during construction, including issues not addressed in the design blueprints. In addition, construction superintendents had the power to approve invoices and modify schedules and blueprints.

137 F. App'x at 200. While Mr. Hall could order certain material for the Project, there are factual questions about his ability to modify or deviate from the design plans and address issues not included in the blueprints. Accordingly, summary judgment is not appropriate on whether Mr. Hall qualified under the FLSA's professional exemption.

**IV. CONCLUSION**[4]

For the reasons set forth above, the Court **GRANTS** Defendant's Motion for

Summary Judgment (Dkt. #25). Judgment shall enter in favor of Defendant Bassett and

Associates, Inc., and against Plaintiff Daniel E. Hall. Mr. Hall's Complaint (Dkt. #5) is

**DISMISSED WITH PREJUDICE**.

Date: May 17, 2021

_____
N. Reid Neureiter
United States Magistrate Judge

---

[4] Because I find that Bassett properly classified Mr. Hall as an administratively exempt employee, I will not address Bassett's argument that the company was not covered by the FLSA or the CWCA.